UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

NATASHA RENEE GIBSON,

        Debtor.

_____/

  NATASHA RENEE GIBSON,

        Plaintiff,

v.

ECMC and COLLEGE ASSIST,

        Defendants.

_____/

Case No. DK 09-04357
Hon. Scott W. Dales
Chapter 7

Adversary Pro. No.  09-80199

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

## I. PARTIES AND NATURE OF THE PROCEEDING

The Plaintiff, Natasha Renee Gibson, filed a voluntary petition for relief under Chapter 7 with this court on April 13, 2009 (the "Petition Date").  In order to discharge her student loans, she commenced an adversary proceeding against her two student loan creditors, ECMC and College Assist (hereinafter the "Creditors").  The Creditors are the successors in interest to other student loan lenders who extended credit to Ms. Gibson before the Petition Date.

On April 14, 2010, in Kalamazoo, Michigan, the court conducted a trial, admitting into evidence fifteen exhibits -- all from the Creditors -- and the testimony of Ms. Gibson. Ms. Gibson was not represented by counsel in this adversary proceeding, but she appeared and gave testimony in support of her complaint.

The following constitutes the court's findings of fact and conclusions of law after trial, in accordance with Fed. R. Civ. P. 52 and Fed. R. Bankr. P. 7052.

## II. JURISDICTION

The court has jurisdiction over Ms. Gibson's bankruptcy case pursuant to 28 U.S.C. § 1334(a) and the automatic referral from the United States District Court.  *See* 28 U.S.C. § 157(a); LCivR 83.2(a) (W.D. Mich.). This bankruptcy court is authorized to enter a final judgment in this adversary proceeding because Ms. Gibson seeks to except the Creditors' claims from discharge under 11 U.S.C. § 523(a)(8), and therefore the adversary proceeding qualifies as a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(I).

## III. APPLICABLE LAW

When Congress excepted student loan debts from discharge under 11 U.S.C. § 523(a)(8), it intended to balance a debtor's fresh start with the public policy of fostering post-secondary education by making financing more available and affordable.  Congress evidently determined that excepting student loan debts from bankruptcy discharges would protect the solvency of student loan lenders and improve collection rates, thereby reducing the cost of such credit to the public generally. Congress advanced these goals at some cost to the Bankruptcy Code's fresh start policy.

With regard to student loans, Congress provides a very limited safety valve for debtors, excusing them from repaying student loan debts only if the debtor can show that repayment would impose an "undue hardship" on the debtor and her dependents.  Specifically, the statute provides, in relevant part, as follows:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—

(8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for—

(A) (i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or

(ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or

(B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual . . .

11 U.S.C. § 523(a)(8).  Over the years, courts have endeavored to give meaning to the term "undue hardship," and eventually settled on the following three-part "*Brunner* Test," named for the Second Circuit's seminal opinion in *Brunner v. New York State Higher Education Service Corp.*, 831 F.2d 395 (2d Cir. 1987).

Under the *Brunner* Test as adopted in the Sixth Circuit, in order to discharge a student loan, the debtor must establish each of the following, by a preponderance of the evidence: (1) that she cannot maintain, based on current income and expenses, a "minimum" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating this state of affairs is likely to persist for a significant portion of the repayment period; and (3) that the debtor has made good faith efforts to repay the loans. *Tirch v. Pennsylvania Higher Education Assistance Agency*, 409 F.3d 677, 682 (6th Cir. 2005); *see also Oyler v. Education Credit Management Corp.*, 397 F.3d 382 (6th Cir. 2005); *Miller v. Pennsylvania Higher Education Assistance Agency*, 377 F.3d 616 (6th Cir. 2004). The court has considered the evidence at trial in light of these authorities.

**Page 4 of 13**

### IV. EVIDENCE PRESENTED AND ANALYSIS

At the trial, the parties stipulated to many material facts, based upon the Defendants' Joint Proposed Findings of Fact and Conclusions of Law (DN 39).

Natasha Gibson ("Ms. Gibson") graduated from high school in 1993 and thereafter earned an associate's degree from Kalamazoo Valley Community College in 2000. Three years later, she earned a bachelor's degree from Davenport University. She also earned a masters in business administration ("MBA") from The University of Phoenix in 2007. To finance her undergraduate and graduate degrees, Ms. Gibson sought and obtained several student loans from the predecessors-in-interest of the present defendants, ECMC and College Assist. While earning these degrees, Ms. Gibson was a single mother, employed full-time by several pharmaceutical companies in Michigan and Ohio.

As of the date of trial, she owed $63,552.76 to College Assist (the "College Assist Loan"). The College Assist Loan consolidated Ms. Gibson's student loan debts arising from her undergraduate degrees, on account of loans dating back to her community college days. As of the date of trial, Ms. Gibson owed $35,424.13 to ECMC (the "ECMC Loans"). The ECMC Loans represent the debts Ms. Gibson incurred to finance her MBA.

At the time of the trial, Ms. Gibson was 34 years old, and a single mother of four dependents ranging in ages from 1 to 16 years old. Neither Ms. Gibson nor any of her children suffers from any profound physical or mental disability. The fathers of her children have generally been remiss in supporting Ms. Gibson and her children. Though she is entitled to receive support, including about $40,000.00 from the father of her oldest child, she has had difficulty collecting. Presently, the father of her other children is contributing approximately $100.00 each month to Ms. Gibson's household, as child support.

The documentary evidence admitted at trial established that Ms. Gibson's annual adjusted gross income reflected on her federal tax returns from 2004 to 2008 ranged from $31,200.00 in 2004 to a high of $84,938.00 in 2006 before coming down to $43,513.00 for tax year 2008. In addition, Ms. Gibson received substantial federal tax refunds during the same period.[1]   For example, she received federal tax refunds as follows:

| 2004 | $4,412.00 |
|------|-----------|
| 2005 | $3,837.00 |
| 2006 | $3,205.00 |
| 2007 | $3,776.00 |
| 2008 | $4,379.00 |

Presently, Ms. Gibson's monthly income is approximately $1,677.00 in unemployment compensation and she receives food stamps in the amount of approximately $444.00 per month. She also receives Medicaid for healthcare and WIC assistance in the amount of approximately $150.00 per month.   Until recently, Ms. Gibson lived in "Section 8" federally subsidized housing, for which she paid $360.00 per month, but because of concerns for her safety and the safety of her children, she moved from the Section 8 housing to another apartment she rents for $644.00 per month, after the government pays subsidies directly to her landlord.

Her monthly expenses average approximately $1,551.00 primarily consisting of transportation, utilities, groceries, clothing and diapers for her youngest child. In addition, Ms. Gibson's monthly expenses include approximately $100.00 per month for cable or internet access and $50.00 per month for recreation, clubs and entertainment, as well as expenses associated with raising four children, including the costs of swimming lessons, band, dance and

---

[1] She also received tax refund checks from the State of Michigan during the same period.

**Page 6 of 13**

other extra-curricular activities. Although Ms. Gibson began working immediately after graduating from high school and for roughly fifteen years thereafter, she has not been gainfully employed since September 2008 when she left her full-time job at Corium, Inc. ("Corium"). Before Corium, Ms. Gibson worked full-time at Pfizer, Inc. ("Pfizer") from 1993 to 2005, and at Alkermes, Inc. ("Alkermes") from 2005 to 2007.

During the trial, Ms. Gibson testified that she left Corium because she refused to participate in work for the company that she regarded as "unethical." Regarding the circumstances of her departure from Corium, she testified, vaguely and equivocally, that she resigned from her employment, but the resignation was not voluntary. She described herself as a "whistle blower" and said she was "black-balled" for reporting Corium's alleged misdeeds to its regulator. She supplied very little explanation and no documentation surrounding her departure from that company. The only evidence, in the form of her testimony, was indefinite.

Similarly, she provided few details regarding why she left her employment at Alkermes, a pharmaceutical company in Ohio. In her deposition she testified that she left Alkermes because she was eager to return to her family in Michigan. At trial, however, she said she developed psychiatric problems while working at Alkermes, related in some way to being one of very few minority workers at the company. She offered no admissible medical testimony or documentation, other than her statement that she was hospitalized for several days on account of an unspecified mental health problem, and has taken medication for it (except during her most recent pregnancy). Ms. Gibson stipulated that Alkermes paid more than her other employers, including her last employer, Corium, so it appears that she left a higher paying job at Alkermes to start a lower paying job at Corium. It is, of course, quite likely that moving back to a

supportive family in Michigan, specifically her mother and grandmother, offset to some extent the decrease in wages.

Ms. Gibson's testimony established that her mother and grandmother provide financial and other support. For example, Ms. Gibson has borrowed more than $600.00 from her grandmother, which she repaid within the last year, and has borrowed more than $4,000.00 from her mother, and repaid approximately $4,000.00 over the last five years.

From, Ms. Gibson's banking statements for the period between July, 2008 and October, 2009 (Creditors' Exhibit C), it would appear that she dines out at restaurants such as McDonalds, Red Robin, Little Caesars, Panera, Burdicks, Golden Chopsticks, Olive Garden, Applebee's, Fazoli's, Niskers, and Wendy's, among other restaurants. Ms. Gibson explained that she tends to order off the "value menu." Indeed, some of the more modest entries on Exhibit C corroborate this testimony, but many other entries do not. The court certainly understands that the time-constraints of a young and busy family such as Ms. Gibson's occasionally require taking meals "on the road," but the number and variety of restaurant charges on Exhibit C undercuts Ms. Gibson's testimony that she is minimizing unnecessary expenses. Eating out is a luxury, in the court's view.

At trial, the Creditors established that Ms. Gibson has spent approximately $120.00 during the last year at a casino, and on lottery tickets. Even accepting the relatively small amount of the gambling expenditures, the fact of such expenditures undercuts Ms. Gibson's argument that she has minimized extraneous expenses. The magnitude of the expenditures is quite small in the court's view, and the law does not demand perfection from those that it serves, but viewed in context, these expenditures support the Creditors' argument that Ms. Gibson is not minimizing expenses.

The second prong of the *Brunner* test requires Ms. Gibson to establish that "additional circumstances exist" indicating that her present financial difficulties are "likely to persist for a significant portion of the repayment period." *Brunner*, 831 F.2d at  396.  In many student loan discharge cases, courts consider a debtor's mental, emotional, and physical disabilities when weighing whether a debtor is likely to get back on her feet and be able to shoulder the student loan burdens that many of us labor to repay.   Here, Ms. Gibson stipulated that neither she nor her children suffers from any such conditions.  Even with respect to the psychiatric difficulties she alluded to, her testimony was that she is being treated, and that her difficulties do not prevent her from returning to work.   Rather, she contends, the distressed Michigan and national economies doom her prospects.  More specifically, she testified that over six million people have lost work during the current recession, and it will take years before she will be able to find a job because she will be competing against so many other displaced workers.

The court understands Ms. Gibson's frustration with the present economic downturn, but is unwilling to ignore the cyclical nature of the economy, or to conclude that generalized economic turmoil may serve as a substitute for a more case-specific evaluation of a student loan debtor's future prospects.  *Educational Credit Management Corp. v. DeGroot (In re DeGroot)*, 339 B.R. 201, 213-14 (D. Or. 2006) (general economic downturn in the debtor's field was not an "additional circumstance" sufficient to satisfy *Brunner* test); *In re Nelson*, 404 B.R. 892, 895 (Bankr. E.D. Wis. 2009) (difficulty caused by downturn in business due to slow economy is a common problem faced by many debtors and does not qualify as an additional exceptional circumstance that satisfies the second prong of *Brunner).*  Ms. Gibson is a well-educated, healthy, thirty-four year old with a history of stable, full-time employment, including employment while raising a family without the assistance of another parent.  She is obviously

distressed by the current economic conditions in Kalamazoo and more generally, our region, and presently unable to find employment despite some effort. Nevertheless, her opinion about the state of the economy and its impact on the labor market in which she finds herself is entitled to very little weight, if any.

Moreover, based upon her testimony, it appears that some of her present financial distress is due to the fact that she is supporting four minor children on her own. Her oldest child, however, will be emancipated in approximately fourteen months, and her next oldest child, in about seven years. Although Ms. Gibson offered no evidence of the repayment period, the court assumes that during this period at least two and possibly three of her children will reach the age of majority, thereby causing her expenses to fall correspondingly.

In short, the court is not convinced that Ms. Gibson's income and job prospects will not improve during the repayment period, and on the expense side, the court believes her expenses will likely decrease during the same period. She has not established special circumstances indicating that her present state of affairs will continue.

On the third prong of the *Brunner* test as adopted in our circuit in *Oyler*, 397 F.3d at 385 and *Tirch*, 409 F.3d at 682, the court is not convinced that Ms. Gibson has made good faith efforts to repay the loans. In reaching this conclusion, the court is particularly moved by the fact that she has not made any payments on account of her debts to the Creditors, and has refused to avail herself of the income contingent repayment programs available to distressed student loan borrowers through the United States Department of Education. Other courts have similarly considered a debtor's unwillingness to participate in income contingent repayment programs in determining the good faith efforts of the student loan borrower to repay the debt. *See e.g., Tirch*, 409 F.3d at 682-83.

Ms. Gibson declined to participate in the United States Department of Education's William D. Ford Direct Loan Program, which would have permitted her to apply for a repayment plan under the program's two income contingent repayment plans.[2] Had she taken advantage of these programs, she would not be required to make any payment under her present circumstances.  And, the balance of her student loan debt would be forgiven at the end of the twenty-five year repayment period.  Nevertheless, she declined to avail herself of the income-contingent repayment programs, explaining that she regarded the repayment trigger levels as "arbitrary." She testified that she should be permitted to enjoy a "middle class lifestyle" before being obligated to make payments under any such program. In other words, she believes that her obligation to begin repaying the loans would commence, under the programs, before her income would support a middle class lifestyle *and* repayment.  This belief evidently prompted her to make a counterproposal more in keeping with her view of the appropriate federal policy.  By design, however, repayment plans under the ICRP and IBRP are the products of regulation, not negotiation.  *See* 34 C.F.R. §§ 685.208 - 685.210.

Ms. Gibson also testified that the twenty-five year repayment period was inconsistent with the Bankruptcy Code's fresh start, and noted that Chapter 13 plans only require payment plans ranging from three to five years.  The argument, however, ignores the fact that student loans are excepted from the Chapter 13 discharge.  *See* 11 U.S.C. § 1328(a)(2).

Finally, Ms. Gibson testified that she declined to participate in the Education Department's income-contingent repayment programs because she was concerned about the tax consequences at the conclusion of the twenty-five year repayment plan, resulting from any debt

---

[2] The Income Contingent Repayment Program (the "ICRP") and the Income Based Repayment Program (the "IBRP") offer different repayment options. The repayment plan under the IBRP is based upon household income and family size. The payment under the ICRP is calculated annually and is subject to change based upon the poverty guidelines for family size as determined by the U.S. Department of Health and Human Services. *See* C.F.R. §§ 685.208 and 685.209.

forgiveness. She conceded that she has no income tax expertise, but testified that her mother is a tax advisor who warned her about the income tax consequences of debt-forgiveness through ICBR/IBRP, in contrast to discharge through bankruptcy.  The court is familiar with cancellation of debt or "COD" income, but puts very little stock in Ms. Gibson's concerns for several reasons. First, the concern is premised on Ms. Gibson's assumption that she would not reduce the principal of her student loans at all during the twenty-five year repayment period, a premise the court does not share. Second, even accepting the premise and acknowledging that the tax laws may change in twenty-five years, at present at least the Internal Revenue Code may provide an exclusion of COD income from taxable income for qualified, insolvent taxpayers.  *See* 26 U.SC. § 108(a)(1)(B). Third, and more generally, the court is not persuaded that a debtor's long-term tax strategy or concerns should foreclose the possibility of at least some debt repayment over the next twenty-five years, particularly in the case of a bright, well-educated, healthy debtor such as Ms. Gibson.  The record does not establish Ms. Gibson's good faith.

In view of the court's findings with respect to Ms. Gibson's income and expenses, the circumstances surrounding her employment and unemployment, including the fact she failed to establish that she involuntarily left her last employer in September 2008, and her unreasonable refusal to pursue the ICRP/IBRP options, the court is not convinced that Ms. Gibson has established the elements necessary to discharge the Creditors' claims.

Ms. Gibson's testimony leaves the court to speculate about what her monthly payment would be on the student loans under the notes she signed, or for that matter, the repayment period.  This makes it difficult to evaluate the burden that any such payments would impose upon her.  In fairness, her position appears to be that *any payment* in addition to her ordinary monthly expenses would impose an undue hardship on her and her dependents, because she is

receiving various forms of public assistance.  Regardless, the court finds that Ms. Gibson has failed to prove that she cannot maintain, based on her current income and expenses, a minimum standard of living for herself and her dependents if forced to repay the loans.  It is quite clear that Ms. Gibson and her children do not live a lavish lifestyle, and the court does not doubt that additional payments on a student loan at this time would impose a hardship on the debtor.  The court is not persuaded, however, that the hardship would be "undue."  Some of Ms. Gibson's expenses, in particular the restaurant expenditures, suggest that she could afford to make at least some payment on account of the loans.

Ms. Gibson is a poised, well-spoken, charming, and healthy individual whose tireless efforts as a single mother on behalf of her children favorably impressed the court.  The court credits her testimony that she moved her family from Section 8 housing to protect the children, and applauds her for enrolling the children in dance and swimming classes, as well as athletic activities.  From the court's own experience, raising a young and active family in today's world presents many logistical, financial, and emotional difficulties, difficulties greatly magnified for a single parent.  It is perhaps ironic that Ms. Gibson's obvious strength and talent should work to her disadvantage in this litigation, but the law requires the court to find a certainty of hopelessness, a finding the court cannot make.

## V. CONCLUSION

Congress has decided that discharging student loans should be the exception rather than the rule.  The court and Ms. Gibson must respect that choice.  For her part, Ms. Gibson has not presented evidence sufficient to bring her case within the exception.  For the foregoing reasons, the court will enter a judgment dismissing the adversary proceeding and Ms. Gibson's complaint

on the merits.  Her obligations to ECMC and College Assist will survive any discharge entered by this court in the above-captioned bankruptcy case.

The court will prepare a separate judgment.

**IT IS SO ORDERED.**

Scott W. Dales
United States Bankruptcy Judge

**Dated: April 30, 2010**